**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

**DEBRA L. PRITT,**

      **Plaintiff,**

**v.**                                **Case No.: 5:13-cv-10036**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

      **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Claimant's application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. This case is assigned to the Honorable Irene C. Berger, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-motions for judgment on the pleadings. (ECF Nos. 10, 17, 18).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for remand be **GRANTED**; that the Commissioner's motion for judgment on

the pleadings be **DENIED**, that the decision of the Commissioner be **REVERSED,** and that this case be **REMANDED** for further proceedings consistent with this opinion.

## I.   <u>Procedural History</u>

Debra L. Pritt ("Claimant") filed an application for SSI on May 24, 2010, alleging a disability onset date of January 1, 2002, (Tr. at 188), due to chronic back pain, chronic abdominal pain, right shoulder pain, and right knee pain. (Tr. at 209). The Social Security Administration ("SSA") denied Claimant's application on September 27, 2010, and again upon reconsideration on February 28, 2011. (Tr. at 24). Claimant requested an administrative hearing, which was held on April 2, 2012 before the Honorable Benjamin R. McMillion, Administrative Law Judge ("ALJ"). (Tr. at 40-86). By written decision dated April 20, 2012, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 24-34). The ALJ's decision became the final decision of the Commissioner on April 2, 2013, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9). Claimant filed a motion for judgment on the pleadings, as did the Commissioner, and Claimant filed a reply memorandum. (ECF Nos. 10, 17, 18, 19). Consequently, the matter is fully briefed and ready for resolution.

## II.   <u>Claimant's Background</u>

Claimant was 41 years old at the time of her application for benefits, and 43 years old at the time of the ALJ's decision. (Tr. at 63, 188). She completed the eighth

grade and communicates in English. (Tr. at 46). Her prior work history includes housekeeping, waitressing, working as a parts assembler at a bedrail factory, and setting up displays at grocery stores. (Tr. at 48-53).

## III.   __Summary of ALJ's Decision__

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 416.920(b). If the claimant is not engaged in substantial gainful employment, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, under the fourth step the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial

gainful activity despite the limitations of his or her impairments. *Id.* § 416.920(e). After making this determination, the ALJ must ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. § 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the regulations. *Id.* § 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* § 416.920a(d). A rating of "none" or

"mild" in the first three functional areas (limitations on activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental function. 20 C.F.R. § 416.920a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s).  The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

*Id.* § 416.920a(e)(4).

In this case, the ALJ confirmed at the first step of the sequential evaluation that Claimant had not engaged in substantial gainful activity since the date of the application. (Tr. at 26, Finding No. 1). At the second step of the evaluation, the ALJ found Claimant to have the following severe impairments: "chronic right shoulder pain, chronic right knee pain, major depressive disorder, generalized anxiety disorder,

posttraumatic stress disorder, and panic disorder without agoraphobia (Tr. at 26, Finding No. 2). Under the third inquiry, the ALJ determined that Claimant's impairments, either individually or in combination, failed to meet or medically equal any of the impairments in the Listing. (Tr. at 27, Finding No. 3). The ALJ then determined that Claimant had "the residual functional capacity to perform light work as defined in 20 C.F.R. § 416.967(b) except that she can never climb ladders, ropes, or scaffolds. She can occasionally reach overhead with the right upper extremity. She should avoid concentrated exposure to extreme cold. She is limited to no more than occasional interaction with the general public." (Tr. at 28-32, Finding No. 4). Therefore, at step four of the process, the ALJ found Claimant capable of performing her past relevant work as a parts assembler and housekeeper. (Tr. at 32-33, Finding No. 5). Nonetheless, with the help of a vocational expert, the ALJ considered Claimant's age, employment history, educational background, transferability of job skills, and RFC and determined that there were also other jobs available in both the regional and national economy that Claimant could perform despite her limitations. (Tr. at 33-34). For example, Claimant could work as a laundry aide, cafeteria attendant, and packing line worker. Accordingly, the ALJ concluded that Claimant was not disabled, as defined in the Social Security Act. (Tr. at 34, Finding No. 6).

## IV.  **Claimant's Arguments**

Claimant raises three challenges to the Commissioner's decision. First, she claims that the ALJ erred by finding that she could perform past relevant work as a housekeeper or a parts assembler. According to Claimant, the time she spent working as a housekeeper and an assembler was so minimal and sporadic that the work could not meet the statutory definition of substantial gainful activity, and thus did not

constitute past relevant work. Second, Claimant argues that the ALJ failed to pose complete hypothetical questions to the vocational expert. Consequently, the vocational expert's opinion that Claimant could do other jobs that were available in sufficient numbers in the regional and national economy was not supported by substantial evidence. Finally, Claimant contends that the vocational expert's testimony was also flawed because she was unable to verify the number of jobs available in the region for each job title she alleged Claimant could do, as required by Social Security Ruling 83-14. Claimant asserts that without this information, the Commissioner fails to carry her burden to show the availability of jobs in sufficient numbers in the economy that can be performed by Claimant.

## V.    **Relevant Medical History**

Although the undersigned had reviewed all of the evidence, including all of the medical records, only the most relevant medical information is summarized below.

### A.    *Treatment Records*

On August 12, 2010, Claimant presented to the office of Dr. Clare Weidman complaining of right shoulder and right knee pain. (Tr. at 321). She reported sustaining a significant injury to her shoulder approximately twenty years earlier that involved a fractured collarbone and torn rotator cuff, and ultimately required surgery. Claimant complained that her shoulder had started to hurt in the past few years, and the pain was increasing, and was now affecting her ability to use her arm. She also indicated that she had undergone arthroscopic surgery in her right knee many years earlier and was experiencing increasing pain in that joint, with a catching sensation. She described the knee giving away from time to time. (*Id.*). Dr. Weidman performed an examination. She noted signs of the prior shoulder injury and surgery, with an

7

apparent defect between the acromion and the collarbone. However, Claimant had an excellent range of motion without impingement. Claimant's knee was stable, although there was marked tenderness throughout the medial joint line and slight effusion, but otherwise the findings were not significant. Dr. Weidman surmised that Claimant had heterotopic bone[1] that might be creating problems in the shoulder, and an internal derangement of the knee. She ordered an MRI of both the shoulder and knee to confirm her assessment. (*Id.*).

Claimant's shoulder MRI revealed a partial thickness articular surface tear of the supraspinous tendon with changes of tendonitis, subacromial bursal effusion possibly related to mild bursitis, and evidence of chronic hypertrophy in the region of the coracoclavicular ligament. (Tr. at 311-12). The knee MRI showed an irregular tear of the inferior articular surface in the junction of body and posterior horn of the medial meniscus, Grade 1 degenerative intrasubstance signal in a discoid lateral meniscus, and small joint effusion. (Tr. at 313). Based upon the films, Dr. Weidman's office recommended physical therapy for Claimant's shoulder and arthroscopy for her knee. (Tr. at 320).

Dr. Weidman performed arthroscopy on Claimant's right knee on October 4, 2010. (Tr. at 315). She located a small fragment of tissue that was catching on range of motion and shaved it. The procedure went well. On follow-up examination the next day, Dr. Weidman documented that the knee had a small effusion and some tenderness at the medial capsule. (Tr. at 319). She instructed Claimant on exercises and icing and prescribed Percocet with no refills. By October 19, 2010, Claimant's knee

---

[1] Heterotopic ossification is the presence of bone in soft tissue where it usually does not exists—generally, as the result of trauma. ©PubMed.gov. National Center for Biotechnology Information, U.S. National Library of Medicine, National Institutes of Health.

was described by Dr. Weidman as looking very good with no effusion, no erythema, and excellent range of motion. (Tr. at 318). Despite this improvement, Claimant asked for more Percocet, claiming that she needed it for her shoulder pain as she waited for an appointment with the pain clinic. Dr. Weidman wrote the prescription, but later learned that the pharmacy would not fill it because Claimant had just had a prescription for Lortab filled that had been given to her by a different physician. Dr. Weidman told Claimant that she would not write Claimant any further prescriptions for narcotic analgesics. (*Id.*). Claimant did not keep her next appointment with Dr. Weidman.

On December 1, 2010, Claimant received care with Dr. Sarita Bennett at Community Care of Marlinton for back pain. (Tr. at 325). Dr. Bennett noted that Claimant had an appointment scheduled with a pain management specialist later in the month, but was seeking narcotic pain relievers, smelled of alcohol, and had a long history of narcotics abuse.

Claimant's next documented medical appointment was on March 19, 2011 with Dr. Jarrett at Pocahontas Medical Practice. (Tr. at 379). Claimant indicated that she had just moved to the area and began having migraine headaches. She also reported a history of chronic neck and back pain, as well as shoulder and right knee surgery. She continued to complain of headaches, back, and neck pain on follow-up visits on April 4 and 13, 2011, and was prescribed Lortab. (Tr. at 375-78). An x-ray of Claimant's cervical spine taken on July 6, 2011 revealed some moderate degenerative changes in the posterior interfacet joint with preserved disc spaces, (Tr. at 387), and a lumbar spine x-ray showed minimal anterior osteophyte formation, mild reduction of height between the L4-L5 consistent with degenerative disc disease, and minor degenerative

9

changes in the SI joints. (Tr. at 388). Similarly, a thoracic spine x-ray demonstrated only minor degenerative changes and minor scoliosis. (Tr. at 389).

Claimant's x-rays were followed in August 2011 by an MRI of the lumbar spine to explore her complaints of radicular pain. (Tr. at 417). The MRI revealed a disc herniation extending into the left lateral recess at L5-S1 with neural encroachment and facet joint hypertrophy. There was also a finding of diffuse annular bulging at L4-5. (*Id.*). The following day, Claimant was seen at the Robert C. Byrd Clinic in Lewisburg, West Virginia for back and neck pain. (Tr. at 402-03). She complained of having pain for many years, which had progressed to numbness in the right lateral leg in the past month. She also felt burning and stinging deep inside. She described having shoulder pain that was worse when she used her arms, and explained that she had previously injured her collarbone and rotator cuff. Physical examination produced tenderness and restriction in the left hip, lumbar spine, thoracic spine, right shoulder, thoracic inlet, and cervical spine. Claimant was assessed with degenerative joint and disc disease of the spine and somatic dysfunction of the lumbar, thoracic, rib, upper extremity, and cervical areas. The assessing physician, Dr. Beatty, recommended osteopathic manipulative treatment, and pain medication. (*Id.*).

Claimant returned to Dr. Beatty's office on September 7, 2011 with continued pain, although she indicated that the treatment had helped temporarily. (Tr. at 401). Dr. Beatty referred Claimant to a neurologist. She requested additional pain medication, which Dr. Beatty refused to prescribe, explaining that he "declined narcotic prescription for this case with contradictory findings between patient evaluation and MRI results." (*Id.*). However, Claimant called two days later, again asking for pain medication, stating that her pain was increasing and she was "still not

able to get to the pain clinic." (Tr. at 400). Therefore, Dr. Beatty relented and wrote a prescription for a 15-day supply of Hydrocodone with no refills.

In January 2012, Claimant sought treatment from Dr. Jeffrey McCray at Bath County Family Practice for vomiting and low back pain. (Tr. at 431-33). On physical examination, Dr. McCray noted that Claimant had a normal range of motion, strength and tone. Her cranial nerves, motor and sensory function, reflexes, gait, and coordination were also all intact. He performed osteopathic manipulation on the cervical, thoracic, lumbar, pelvic, sacral, upper and lower extremity regions and initiated a pain clinic referral. (Tr. at 433).

On March 13, 2012, Claimant presented to the office of Dr. Weidman requesting an injection in her right knee for osteoarthritis. (Tr. at 429-30). She apparently had received an injection four months earlier with significant benefit. Claimant reported having difficulty walking, tingling, numbness, joint pain and stiffness, back pain, soft tissue swelling, anxiety, depression, and insomnia, although otherwise "being in good general health recently." (Tr. at 429). Her physical examination revealed crepitus in the knee with tenderness and mild effusion. However, the knee was stable, and Claimant had a full range of motion in the hip. Dr. Weidman diagnosed moderate patellofemoral joint osteoarthritis and injected the knee with a combination of Kenalog and Marcaine. (Tr. at 430). Claimant was instructed to return in three months, or sooner if needed.

The last treatment record in evidence was supplied after the hearing, but was incorporated into the evidence and explicitly considered by the ALJ. (Tr. at 26, 451-54). On March 22, 2012, Claimant was seen at the Northern Greenbrier Health Clinic for back pain. She advised that she was a patient of Dr. McCray and had been referred

for pain management, but her records had been misplaced. She had some blood work performed at the clinic that was positive for Hepatitis C. Claimant's physical examination revealed decreased range of motion and pain in the lower back. Claimant was given a shot of Nubain and instructed to resubmit her records to the pain center.

## B.    Disability Evaluations

On May 20, 2010, Dr. William Browning completed an examination of Claimant at the request of the West Virginia Department of Health and Human Resources Medical Review Team. (Tr. at 272-74). Claimant's statement of disability was back pain, abdominal pain, and nerves. Dr. Browning found Claimant to have positive right upper abdominal pain, major depression with anxiety, and numerous areas of musculoskeletal pain. He diagnosed her with chronic right upper quadrant pain secondary to Hepatitis C; chronic spinal pain of uncertain etiology; chronic right shoulder pain; and major depression with anxiety. (Tr. at 273). Dr. Browning opined that Claimant could not work at her customary occupation as a laborer due to her inability to lift and bend, and could not do other work due to disabling depression and stress associated with exposure to the public. He felt she should avoid any work situation that required lifting more than 5 pounds. Dr. Browning believed that Claimant's disability would last as long as one year. He suggested that she undergo MRI testing of her cervical and lumbar spine, and perhaps her shoulder, and that she see a psychiatrist, gastroenterologist, orthopedist, and possibly a neurologist. He did not think vocational rehabilitation was advisable.  (Tr. at 274).

On September 24, 2010, Debra Lilly, Ph.D., was asked by the SSA to complete a Psychiatric Review Technique to assess Claimant's mental impairments. (Tr. at 284-87).  Dr. Lilly responded that there simply was not enough evidence of psychiatric

allegations in the file upon which to opine that a mental impairment existed. Jeff Harlow, Ph.D., was asked to give a second opinion, and he agreed with Dr. Lilly. (Tr. at 327).

Dr. Fulvio Franyutti completed a Physical Residual Functional Capacity Assessment on September 27, 2010 at the request of the SSA. (Tr. at 298-305). He opined that Claimant could occasionally lift and carry 50 pounds, frequently lift and carry 25 pounds, and could stand, walk, and sit, each, about six hours in an eight hour workday. He also believed Claimant had unlimited ability to push and pull. Dr. Franyutti opined that Claimant had some postural limitation; while she could frequently climb ramps and stairs, balance, stoop, kneel, and crouch, she could only occasionally climb ladders, ropes, and scaffolds and crawl. However, he found that Claimant had no manipulative, visual, or communicative limitations. Dr. Franyutti suggested that Claimant avoid concentrated exposure to extreme heat and cold, fumes, odors, gases, dusts, poor ventilation, and hazards, but had no other environmental limitations. He expressly disagreed with Dr. Browning's opinion of disability, instead stating that Claimant was capable of performing medium level exertional work. (Tr. at 304).

On February 16, 2011, Claimant was evaluated at the request of the SSA by psychologist, Judith F. Lucas, M.A. (Tr. at 337-40). Ms. Lucas performed an interview and mental status examination of Claimant. According to Ms. Lucas, Claimant arrived at the evaluation by bus. She stated that she was unable to work due to shoulder and knee problems, as well as headaches with associated nausea and vomiting and Hepatitis C. She described her primary psychological symptoms as paranoia, depression, panic attacks, excessive worry, and nervousness. She stated that she was

homeless and had difficulty sleeping due to pain and worry. Claimant reported that she had never had any psychiatric treatment. On mental status examination, Claimant's speech was relevant and coherent; she was oriented in all spheres, but anxious; her thought processes were logical and organized; her affect was restricted; her perception, judgment, and thought content were normal; her immediate, recent, and remote memory were also normal; her concentration was deficient based on her ability to do serial threes; and Claimant shook excessively and fidgeted throughout the evaluation. Ms. Lucas diagnosed Claimant with generalized anxiety disorder, major depressive disorder, posttraumatic stress disorder, and panic disorder without agoraphobia. (Tr. at 339).

A second Physical Residual Functional Capacity Assessment was obtained by the SSA from Dr. Narrendra Parikshak on January 15, 2011. (Tr. at 328-35). Dr. Parikshak agreed entirely with the assessment completed by Dr. Franyutti with the single exception that Dr. Parikshak felt Claimant had only one environmental limitation; that being, to avoid concentrated exposure to extreme cold. He also expressly disagreed with Dr. Browning's opinion of disability. Dr. Parikshak commented that Claimant's description of her symptoms was only partially credible. He noted that Claimant's right shoulder and right knee problems had resolved with intervention, and he was suspicious of Claimant's narcotic-seeking behavior. (Tr. at 333).

A third psychological assessment was obtained by the SSA on February 28, 2011 when John Todd, Ph.D., completed a Psychiatric Review Technique. (Tr. at 342-69). Dr. Todd determined that Claimant had major depressive disorder and generalized anxiety disorder; however, these disorders were not a severe impairment. He found no

14

evidence that Claimant was restricted in activities of daily living, had difficulties in social functioning, or had episodes of decompensation of extended duration. He did opine that Claimant had mild difficulties in maintaining concentration, persistence or pace. Dr. Todd found no evidence of paragraph C criteria. He noted that Claimant was only partially credible when describing the intensity of her psychiatric symptoms given that she had never sought treatment for them and took no psychotropic medications. He also expressed skepticism with Claimant's allegations of difficulties maintaining concentration, pointing out that she had performed tasks requiring sustained concentration and was able to pay attention for at least one hour at her psychological examination. (Tr. at 354).

## VI.    __Standard of Review__

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the totality of the record and determine whether substantial evidence exists to support the conclusion of the Commissioner. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990). Thus, the decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no

15

disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 2001)). If substantial evidence exists, then the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.  Discussion

In this case, the Commissioner's decision is not supported by substantial evidence for two reasons. First, the ALJ failed to follow applicable guidelines when progressing through the steps of the sequential evaluation process. Second, the ALJ failed to fully resolve inconsistencies in the evidence or, at least, he never explained his reconciliation of the contradictions. Consequently, the decision should be reversed, and this matter remanded for further proceedings.

### A.    Past Relevant Work

At the fourth step of the sequential evaluation process, the ALJ must ascertain whether a claimant is capable of performing past relevant work. 20 C.F.R. § 416.920(a)(iv). Past relevant work is "work that [a claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it." 20 C.F.R. § 416.960(b)(1); *see also* 20 C.F.R. § 416.965(a); *Connolly v. Bowen*, No. 88-3116, 1989 WL 79726, at *2 (4th Cir. Jul. 14, 1989) (holding that "in order to be classified as past relevant work, for the purpose of determining disability, the work must have been substantial gainful activity").Here, Claimant contends that the ALJ erred by finding that she was capable of doing past relevant work as a parts assembler in a factory and as a housekeeper, because neither of those jobs constituted "substantial gainful activity" under the Social Security guidelines. Accordingly, the ALJ's decision was based upon an incorrect application of

the law.

Social Security regulations define substantial gainful activity as "work activity that is both substantial and gainful." 20 C.F.R. § 416.972. Work is "substantial" when it involves "doing significant physical or mental activities." *Id.* § 416.972(a). Work may be substantial "even if it is done on a part-time basis," and the claimant does less, gets paid less, or has less responsibility than in prior employment positions. *Id.* Work is considered "gainful" when it is done for pay or profit regardless of whether a profit is actually realized. *Id.* § 416.972(b). However, activities like self-care, household chores, hobbies, therapy, school attendance, and social programs are not considered to be substantial gainful activity. *Id.* § 416.972(c).

The regulations use earnings guidelines to assist with the determination of whether past work constitutes substantial gainful activity. 20 C.F.R. § 416.974. Under the guidelines, if a claimant earned an average of $300 per month for periods worked between 1980-1989, $500 per month for periods between January 1990-June 1999, and $700 per month for periods worked between July 1999 and December 2000, the earnings demonstrate that the claimant engaged in substantial gainful activity. *Id.* § 416.974(b)(2)(i). Nevertheless, while earnings of less than these amounts are insufficient to raise a presumption of substantial gainful activity, the guidelines do not direct that such wages conclusively establish that the claimant did not engage in substantial gainful activity. *See Reeder v. Apfel,* 214 F.3d 984, 989 (8th Cir. 2000) (quoting *Pickner v. Sullivan,* 985 F.2d 401, 403 (8th Cir. 1993) ("Although earnings below the guidelines will 'ordinarily' show that an employee has not engaged in substantial gainful activity, earnings below the guidelines will not conclusively show that an employee has not engaged in substantial gainful activity").

17

In this case, Claimant's wage documentation reflects that her prior work did not presumptively constitute substantial gainful activity under the earnings guidelines, a fact that the Commissioner concedes in her brief. However, the Commissioner contends that even if the ALJ erred at step four by finding that Claimant's past work was substantial gainful activity, which Claimant could still perform, the error was harmless because the ALJ proceeded to make a step five finding. Claimant disagrees with the Commissioner's contention on the ground that the step five finding made by the ALJ was also flawed. Therefore, Claimant argues ALJ's step four error was not harmless.

Having reviewed the record, the undersigned agrees that the ALJ erred at step four of the sequential process when he found that Claimant's prior work constituted substantial gainful activity and thus was past relevant work. The evidence relating to Claimant's work history is ambiguous and inconsistent; particularly, in regard to when and for what periods of time Claimant worked as a housekeeper and parts assembler, the two occupations that the ALJ found Claimant still capable of performing. Moreover, the wage documentation for the fifteen-year time frame prior to Claimant's application for benefits reflects eight years of no annual earnings and six years of annual earnings of less than one thousand dollars. The most that Claimant ever earned in one tax year during that fifteen-year period was in the year 2000 when she earned $2407.47, and it appears that her income came from three different jobs. (Tr. at 200).

According to the hearing transcript, the ALJ incorrectly[2] looked at the fifteen years preceding January 1, 2002, Claimant's alleged onset of disability, when assessing

---

[2] According to SSR 82-62, "when deciding whether a claimant is disabled under title II or title XVI, the 15-year period is generally the 15 years prior to the time of adjudication at the initial, reconsideration or higher appellate level." 1982 WL 31386, at *2 (1982).

her prior relevant work. (Tr. at 49). Even still, although Claimant's wages during that fifteen-year period were slightly higher than her more recent wages, they again were not indicative of substantial gainful activity when applying the earnings guidelines. According to the guidelines, average earnings of $300 per month during the calendar years of 1980-89 sufficed to make a presumptive showing of substantial gainful activity. 20 C.F.R. § 416.974(b)(2)(i). Although Claimant presumably earned close to the requisite $300 per month in 1988 and 1989, it is not clear that Claimant made those earnings working as a housekeeper or a parts assembler. Furthermore, when the ALJ referred to the past relevant work that he believed Claimant could still perform, the ALJ did not point to work performed in 1988 and 1989, but instead to housekeeping done seasonally at unspecified times between 1990-1999 and assembly work done for one month in the year of 2000.

Consequently, the undersigned **FINDS** that the ALJ incorrectly applied the pertinent regulations and rulings when he found that Claimant's prior work as a parts assembler in a factory and a housekeeper constituted past relevant work that she was still capable of performing.

### B.    *Incomplete Hypothetical Questions*

Claimant complains that the ALJ's alternative finding was similarly flawed because it was based upon an unreliable expert opinion. Claimant points out that the ALJ found Claimant to have a moderate impairment in concentration yet failed to include that limitation in the hypothetical questions posed to the vocational expert. Accordingly, the expert's opinion that Claimant was capable of performing the jobs of laundry aide, cafeteria attendant, and packing line worker did not take into account all of Claimant's impairments.

It is well established that for a vocational expert's opinion to be relevant, it must be in response to a proper hypothetical question that sets forth all of the claimant's impairments. *Walker v. Bowen,* 889 F.2d 47, 50-51 (4th Cir. 1989). To frame a proper hypothetical question, the ALJ must first translate the claimant's physical and mental impairments into a RFC that is supported by the evidence; one which adequately reflects the limitations imposed by the claimant's impairments. *Lacroix v. Barnhart,* 465 F.3d 881, 889 (8th Cir. 2006). "[I]it is the claimant's functional capacity, not his clinical impairments, that the ALJ must relate to the vocational expert." *Fisher v. Barnhart,* 181 Fed.Appx. 359, 364 (4th Cir. 2006). A hypothetical question will be "unimpeachable if it adequately reflects a residual functional capacity for which the ALJ had sufficient evidence." *Id.* (citing *Johnson v. Barnhart,* 434 F.3d 650, 659 (4th Cir.2005)) (internal quotation marks omitted).

The Commissioner concedes that the ALJ was required to fairly represent Claimant's impairments in the hypothetical questions posed to the vocational expert; however, the Commissioner contends that the ALJ fulfilled that duty. The Commissioner emphasizes that the ALJ found Claimant to have a moderate limitation in maintaining concentration at step three of the sequential process, and accommodated that finding at step five by limiting Claimant to "unskilled work." The Commissioner argues that the vocational expert clearly "understood that the ALJ was focused on unskilled work," to make allowances for Claimant's impaired concentration, and offered only unskilled positions in her testimony. According to the Commissioner, the ALJ was not required to expressly include Claimant's moderate impairment in concentration in the hypothetical questions as long as the ALJ implicitly accounted for Claimant's concentration deficit by restricting her to unskilled occupations.

An ALJ "has great latitude in posing hypothetical questions" to a vocational expert, *Koonce v. Apfel,* 166 F.3d 1209, 1999 WL 7864, at *5 (4th Cir. 1999), and the Commissioner is correct that a hypothetical question limiting a claimant to unskilled work[3] may, at times, be sufficient to account for certain mental impairments. *Fisher v. Barnhart,* 181 Fed.Appx. 359, 364 (4th Cir. 2006) (citing *Howard v. Massanari,* 255 F.3d 577, 582 (8th Cir. 2001). Nonetheless, the Commissioner's argument is unpersuasive for the simple reason that it relies upon a skewed reading of the record.

The Commissioner claims that the ALJ "limited [Claimant] to unskilled work with no more than occasional interaction with the general public" as a way to accommodate her mental impairments, including her moderate concentration deficit. However, nowhere in the record does the ALJ actually limit Claimant to unskilled work.[4] Without question, the first place such a limitation should appear is in the Claimant's RFC; particularly, as the RFC is the foundation upon which the ALJ makes decisions at steps 4 and 5 of the sequential evaluation process. But here, the only limitation included in Claimant's RFC in any way related to her mental impairments is a restriction on her contact with the general public. Contrary to the Commissioner's assertion, the ALJ did not include in Claimant's RFC a limitation to unskilled work.

---

[3] "'Unskilled work' is a term of art, defined by regulation as 'work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.'" *Fisher v. Barnhart,* 181 Fed.Appx. 359, 364 (4th Cir 2006) (quoting 20 C.F.R. § 404.1568(a).

[4] The Commissioner is misguided in her reliance on a single sentence contained in the written decision stating that the ALJ consulted with a vocational expert to determine the extent to which Claimant's limitations eroded "the unskilled light occupational base" as proof that the ALJ intended to limit Claimant to unskilled work. The transcript of the administrative proceedings plainly demonstrates that the ALJ never instructed the vocational expert to assume that Claimant was limited to unskilled work, nor is there any exchange in the record to indicate that the vocational expert understood that Claimant had specific skill limitations. Although the vocational expert eliminated Claimant's two prior semi-skilled occupations as being appropriate for her, considering her RFC, it is likely that those occupations were eliminated for reasons other than skill level. For example, Claimant's restriction to only occasional contact with the general public would certainly prevent her from waitressing.

Moreover, the ALJ did not include such a limitation in his hypothetical questions to the vocational expert. While it is true that the vocational expert identified only unskilled occupations in her testimony, that appears to have been a happy accident rather than the result of the ALJ's focused hypothetical questions.

A review of the record reveals several errors by the ALJ in his treatment of Claimant's mental impairments that cannot be viewed as harmless. The ALJ's first mistake was in failing to lay the requisite ground work for an accurate mental RFC assessment. At the second step of the sequential process, the ALJ determined that Claimant had severe impairments of major depressive disorder, generalized anxiety disorder, posttraumatic stress disorder, and panic disorder without agoraphobia. (Tr. at 26). Although the ALJ does not fully explain the basis for this finding, it appears that he accepted the diagnoses of Judith F. Lucas, M.A., a consulting psychologist who performed an evaluation of Claimant at the request of the SSA. Then, in accordance with the regulations, the ALJ rated the degree of functional limitation associated with the impairments to establish their level of severity. 20 C.F.R § 416.920a(b)(2). To accomplish this, the ALJ measured Claimant's capacities against four broad functional areas, also called paragraph B criteria, including (1) activities of daily living; (2) social functioning; (3) concentration, persistence, and pace; and (4) episodes of decompensation. With the first three functional areas, the ALJ used a five-point scale to rate function, measuring the degree of limitation in each area to be none, mild, moderate, marked, or extreme. *Id.* § 416.920a(c). With the last area, the ALJ used a four-point scale ranging from none to four episodes. In his written decision, the ALJ discussed his rating of Claimant's functional limitations and the severity assessment of her mental impairments as part of the step three evaluation. The ALJ noted that

Claimant had moderate difficulties in the broad functional area of maintaining concentration, persistence, and pace; had mild restrictions in activities of daily living and social functioning; and had no episodes of decompensation.

Once the rating was completed and the severity assessed, the ALJ moved to the next step of the process, which involved comparing Claimant's severe mental and physical impairments to those disorders included in the Listing. The ALJ correctly concluded that the Claimant did not have any impairment of listing-level severity. Accordingly, the ALJ was required to determine Claimant's RFC, which is an assessment of Claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1 (1996). Social Security Ruling 96-8p cautions disability adjudicators to bear in mind that limitations identified in paragraph B criteria (the four broad functional areas used to rate the severity of a mental impairment) are not an RFC assessment. *Id.* at *4. To the contrary, once a broad functional area is determined to be limited, *a more detailed assessment* of various functions or activities within the area should be conducted in order to establish an accurate mental RFC assessment. *Id.* "Work-related mental activities generally required by competitive, remunerative work include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." *Rinehart v. Colvin*, 2014 WL 1910055, at *12 (D.Kan. May 13, 2014) (quoting West's Soc. Sec. Reporting Serv., Rulings 149 (Supp. 2013)). The ALJ clearly understood this distinction, as well as the importance of a function by function analysis to achieving an accurate RFC, as he noted in his written decision that "the limitations identified in the

23

'paragraph B' criteria are not a residual functional capacity assessment" and "[t]he mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions in the broad categories." (Tr. at 27). Yet, inexplicably, the ALJ simply failed to assess how Claimant's concentration deficit affected her ability to perform basic work-related activities.

The ALJ found Claimant to have four severe psychiatric disorders, which affected three of the four broad functional areas; most significantly, the area of concentration, persistence and pace. Yet, the ALJ never obtained a formal function-by-function analysis of how those disorders manifested in Claimant's ability to do work-related activities. The ALJ had Ms. Lucas conduct an examination of Claimant, and agency experts complete Psychiatric Review Technique Forms, but never asked any of these experts to complete a Mental Residual Functional Capacity Assessment Form, SSA-4734-F4-SUP. While the ALJ was not necessarily required to obtain an expert opinion on the Claimant's mental RFC, at a minimum, the ALJ should have discussed in his written decision the evidence of record relating to those functions identified by the SSA as being measurements of a claimant's capacity to concentrate, persist, and maintain a reasonable pace.[5] The ALJ provided a healthy summary of Claimant's functions within the broad area of activities of daily living, and a sufficient summary of her social functioning. However, the only function by function analysis provided by the

---

[5] For example, Form SSA-4734-F4-SUP includes the following functions under concentration, persistence and pace: the ability to carry out very short and simple instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods of time; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to sustain ordinary routine without special supervision; the ability to work in coordination with or proximity to others without being distracted by them; the ability to make simple work-related decisions; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.

ALJ relating to Claimant's moderate impairment in the broad area of concentration was a note that Claimant stated she could "follow written/spoken instructions "OK" or "fair," pay bills, count change, handle a savings account, and use a checkbook." (Tr. at 32). This analysis is plainly insufficient given that lack of concentration was the primary limitation associated with Claimant's mental impairments.

The ALJ's second error was including a limitation in Claimant's RFC without providing a clear and logical reason for it. "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts ... and nonmedical evidence." SSR 96-8p, 1996 WL 374184, at *7. Ultimately, the ALJ included one limitation in Claimant's RFC associated with her mental impairments: "[Claimant] is limited to no more than occasional interaction with the general public." However, the ALJ's written decision contains no meaningful explanation of how this particular limitation is supported by the evidence.

In discussing Claimant's mental RFC finding, the ALJ examined the clinical notes of Judith Lucas, M.A., reflecting her psychological evaluation of Claimant. (Tr. at 31). The ALJ reviewed Claimant's symptoms, diagnoses, and daily activities. He noted that Claimant had moderately deficient concentration and fidgetiness when examined by Ms. Lucas, but Claimant's *social functioning*, persistence, and pace were *normal.* The ALJ accorded "great weight" to these clinical records. He also mentioned that Claimant testified at the administrative hearing that she drove to the hearing, got lost, and was nervous and sick. Yet at the same time, he noted that Claimant was able to live alone on the river and attend to her daily needs independently. (Tr. at 32). Claimant admitted in her Adult Function Report that she had no issues getting along with family, friends, neighbors, and others, and did well with authority figures. The ALJ

25

examined the opinions of the agency experts, who either found insufficient evidence to support the existence of mental impairments, or found the impairments to be non-severe. The ALJ gave these opinions only "some" weight. Certainly, Dr. Browning opined that Claimant was unable to work due to her stress around the general public; however, the ALJ essentially rejected Dr. Browning's opinions, finding them to be inconsistent with the other evidence of record. (Tr. at 32). In the end, the ALJ summarized his review of the evidence, finding that while Claimant had physical and psychiatric limitations that affected her ability to perform basic work activities, she was still able to perform work at the "light exertional level."

Unfortunately, this discussion sheds no light on why Claimant's RFC includes a restriction to no more than occasional contact with the public, or how that restriction accounts for Claimant's moderate deficiency in maintaining concentration. Clearly, if Claimant's concentration is not significantly affected by her contact with the public, then this RFC restriction fails to address, even partially, the limitations on Claimant's employability caused by her mental impairments. Moreover, the record is ambiguous as to the triggers of Claimant's problems with concentration. At the administrative hearing, Claimant testified that she gets anxious around people and cannot concentrate, (Tr. at 54), but she also stated that her lack of concentration is the result of nerves, pain, fidgetiness, and restlessness. (Tr. at 66). Ms. Lucas documented that Claimant displayed a moderately deficient concentration, without a specific triggering event, based upon her mental status examination, and noted that Claimant had behaviors suggestive of Attention Deficient Hyperactivity Disorder, including excessive shaking and fidgetiness. (Tr. at 339). Claimant admitted to Ms. Lucas that she had poor concentration of recent origin, but did not attribute it to any particular cause.

26

Certainly, the psychiatric disorders with which Claimant has been diagnosed could potentially affect her concentration, as could her current living situation of being homeless and forced to move from one location to another. The ALJ does not attempt to reconcile this evidence, nor pinpoint the evidence that he relied upon in finding that Claimant could not tolerate more than occasional contact with the general public.

Likewise, the ALJ failed to explain why other limitations more commonly associated with an impaired ability to maintain concentration were not adopted as part of Claimant's RFC. For example, some courts have found that limiting a claimant to simple, routine, and unskilled tasks, *Farrell v. Colvin,* No. TMD 11–2995, 2014 WL 1764928 (D.Md. Apr. 30, 2014); to a low stress environment, *Bishop v. Astrue,* No. 09-cv-1956, 2010 WL 3397526, at *10 (D.S.C. Aug. 26, 2010); to simple, routine, and repetitive tasks, *Davis v. Commissioner,* ---F.Supp.2d---, 2014 WL 1292884, at *10 (M.D.Fla. Mar. 28, 2014); to unskilled work that does not require the performance of complex tasks, *Howard v. Massanari,* 255 F.3d 577, 582 (8th Cir. 2001); and to rare public interaction combined with low stress and one-to-two step instructions, *Bordelon v. Astrue,* 281 Fed.Appx. 418, 423 (5th Cir. 2008), have accounted for a claimant's moderate concentration limitations; *but see Sexton v. Colvin,* ---F.Supp.2d---, 2014 WL 2090647, at *3 (W.D.Va. May 19, 2014) (A limitation to unskilled or simple work may not adequately account for moderate deficiencies in concentration). Of course, to have adequately accounted for Claimant's impaired concentration, the ALJ would have had to fully explore how that impairment revealed itself in Claimant's performance of specific work-related functions; a task which was not done here.

The ALJ's third error occurred in his questioning of the vocational expert. The undersigned agrees with Claimant that the ALJ did not present the vocational expert

with a hypothetical question that adequately incorporated all of the impairments attributed to Claimant by the ALJ. The ALJ then compounded this error by eliciting testimony from the vocational expert, which introduced ambiguity into the record that was never resolved by the ALJ. Contrary to the Commissioner's contention, the ALJ did not ask the vocational expert to assume that Claimant was restricted to unskilled work. Instead, the ALJ asked the vocational expert to assume an individual of the same age, work background, and education as Claimant; who could perform work at the light exertional level; who could never climb ladders, ropes, scaffolds; who could only occasionally perform overhead reaching with the right shoulder; who should avoid concentrated exposure to cold; and who should have occasional interaction with the general public. Based only upon those limitations, the ALJ asked the vocational expert to identify jobs that the individual could perform.

As Claimant points out, this hypothetical question does not sufficiently account for the ALJ's finding that Claimant has moderate impairment in the broad functional area of concentration, persistence and pace; specifically, as a result of her impaired concentration. While the undersigned does not agree with Claimant that the ALJ had to explicitly include the phrase "moderate impairment of concentration" in his hypothetical question in order to fulfill his obligation to fairly incorporate all of Claimant's limitations, a number of courts have so ruled, and others have stressed the requirement that hypothetical questions reflect, in tangible terms, the true nature and extent of a claimant's work-related impairments. *See, e.g. Miller v. Colvin,* 2014 WL 1910495, at *4 (M.D.Pa. May 13, 2014) (Third Circuit repeatedly holds that an ALJ's failure to include moderate limitations of concentration in hypothetical questions merits remand); *Hartung v. Colvin,* ---F.Supp.2d----, 2014 WL 1278629, at *7

(W.D.Wis. Mar. 28, 2104) (In the Seventh Circuit, hypothetical questions limiting claimant to unskilled, simple, repetitive work do not sufficiently account for moderate impairment of concentration, persistence, or pace); *Sexton v. Colvin,* ---F.Supp.2d---, 2014 WL 2090647 (W.D.Va. 2014) (Limiting a vocational expert's inquiry to routine, unskilled, and simple work may not properly account for moderate deficiencies in concentration); *Karabinas v. Colvin,* ---F.Supp.2d---, 2014 WL 1600455, at *8 (W.D.N.Y. Apr. 21, 2014) (The ALJ need not incorporate the terminology "moderate impairment of concentration" verbatim, but must transform the limitation into concrete terms for use in hypothetical questions); *Schnack v. Comm'r of Soc. Sec.,* No. 12–cv-14837, 2014 WL 1304816, at *7-8 (E.D.Mich. Mar. 31, 2014) (Whether a limitation to unskilled and routine work is sufficient to account for a moderate impairment in concentration depends upon whether the record as a whole supports the ALJ's RFC assessment); *Davis v. Comm'r of Soc. Sec.,* ---F.Supp.2d---, 2014 WL 1292884 (M.D.Fla. Mar. 28, 2014) (A limitation to simple, routine tasks adequately addresses a moderate limitation in concentration where the record shows that the claimant can perform such tasks).

Curiously, neither Claimant nor the Commissioner addresses the fact that the ALJ asked a supplemental hypothetical question that actually alluded to Claimant's impaired concentration. The ALJ asked the vocational expert if an individual "due to psychologically-based symptoms, would be off task greater than 25 percent of the workday, how would that affect the jobs previously listed?" (Tr. at 78). In response, the vocational expert indicated that the individual would be incapable of performing any work in the national economy. Claimant's attorney inquired in follow-up:

Atty:   If we reduce that time off task, Ms. Wells, from 25 percent to 10 percent what would your answer be?

VE:   To time off task? That would be an acceptable amount.

Atty:   It would be acceptable?

VE:   Anything over that ... anything over that, though, gets a little shady.

Atty:   So if it was 11 percent no jobs?

VE:   Yes.

(Tr. at 78-79). Despite raising the issue, receiving the response that Claimant would be incapable of performing any work, and listening to follow-up questioning by Claimant's attorney, the ALJ never effectively resolved the issue of the extent to which Claimant's psychologically-based symptoms caused her to be "off task" during an eight-hour workday. This failure is particularly troubling given that the ALJ found Claimant to be "moderately" impaired in maintaining concentration, and suggested by his question that he considered the term "moderate" to constitute around 25% of the workday. Indeed, at least one court agrees that "[i]t is difficult to reasonably accept 'moderate' to mean anything less than 20%-30% of the time at work." *Green v. Comm'r of Soc. Sec.,* No. 08-11398, 2009 WL 2365557, at *10 (E.D.Mich. July 28, 2009). Moreover, the vocational expert testified that even if Claimant was "off task" only 11% each workday, she would be incapable of performing any work available to an individual with her RFC. Despite this testimony, the ALJ made no effort to address the merits or applicability of the vocational expert's opinion to Claimant's case, or reconcile it with his contradictory disability determination.

In summary, the ALJ found, based upon the evidence, that Claimant had a moderate limitation in the broad functional area of concentration, persistence, and

pace. He also gave great weight to the clinical finding of Ms. Lucas that Claimant had moderately deficient concentration. Yet the ALJ failed to translate that impairment into concrete functional terms, failed to clearly incorporate corresponding limitations into Claimant's RFC, and failed to provide any explanation in his opinion for how he addressed Claimant's concentration deficit. Furthermore, the ALJ included a mental limitation in Claimant's RFC that appeared to be based, at least partially, on the statement of a consulting expert whose opinions the ALJ explicitly discounted. Finally, the ALJ asked a hypothetical question that touched on Claimant's concentration deficit, received an answer contrary to his disability opinion, yet failed to fulfill his obligation to discuss and reconcile this conspicuous conflict in the record. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (The ALJ is charged with the task of resolving conflicts in the evidence). The end result is a decision that is not supported by substantial evidence.

Therefore, the undersigned **FINDS** that the ALJ failed to properly conduct a mental RFC assessment, failed to provide an adequate explanation of his assessment, failed to ask hypothetical questions based upon an adequate mental RFC, and failed to reconcile conflicting evidence.

### C.    *Failure to Comply with SSR 83-14*

Claimant's final argument involves the alleged failure of the vocational expert to provide for each job that Claimant could do functionally and vocationally an accurate statement of the incidence of that job in the region where Claimant resides or in several regions of the country as required by Social Security Ruling 83-14. The Commissioner argues in response that the vocational expert complied with the Ruling's requirements. Social Security Ruling 83-14 states in relevant part:

> Whenever a vocational resource is used and an individual is found to be not disabled, the determination or decision will include (1) citations of examples of occupations/jobs the person can do functionally and vocationally and (2) a statement of the incidence of such work in the region in which the individual resides or in several regions of the country.

1983 WL 31254, at *4 (1983). The ALJ's written decision contains examples of jobs that the ALJ believed Claimant could do functionally and vocationally, and a statement of the incidence of such work nationally and in West Virginia. (Tr. at 34).

Therefore, the undersigned agrees with the Commissioner and **FINDS** that the stated requirements of SSR 83-14 were met.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the United States District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's motion for a remand, (ECF No. 10); **DENY** Defendant's Motion for Judgment on the Pleadings (ECF No. 17, 18), **REVERSE** the final decision of the Commissioner, **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this opinion; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the

"Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Berger and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** June 3, 2014

Cheryl A. Eifert
United States Magistrate Judge

33